## AFFIDAVIT OF DAVID C. CROMPTON

I, David C. Crompton, declare under oath as follows:

1. I am the president and Chief Executive Officer of Quick Fitting, Inc., a company headquartered and located at 30 Plan Way, Warwick, RI 02886 ("Quick Fitting"), and I make this affidavit based on my own personal knowledge or on knowledge derived in the course of my duties at Quick Fitting.

2. Quick Fitting sells its push-fit plumbing products throughout North America, in retail outlets and to wholesalers under its own brands, and to "OEM" or "original equipment manufacturing" customers specifically designed and packaged for their brands.

3. Quick Fitting carefully restricts the use of its patented technology, its trade secrets, its trademarks, and its confidential and proprietary business information, and permits their use only under carefully controlled conditions pursuant to written agreement. Quick Fitting carefully controls access to its proprietary manufacturing drawings and does not distribute those manufacturing drawings to any persons or companies not covered by strict confidentiality, non-disclosure, and non-competition agreements.

4. Internally, Quick Fitting limits access to which employees have access to our manufacturing drawings that actually contain and include the information necessary to manufacture (forge, tool, assemble, and finish) the products. Quick Fitting has employees review and execute confidentiality agreements that declare and are designed to restrict the use and dissemination of our confidential and proprietary information.

5. The 2010 License and Supply Agreement ("2010 License Agreement") contained terms of strict confidentiality, non-disclosure, and non-competition and granted a license to use information from Quick Fitting "solely…in connection with the manufacture of

[products] on behalf of and for distribution by Quick Fitting…" The 2010 License Agreement also dealt with product quality issues.

6. Submitted as QF Omnibus Exhibit I are true and accurate copies of the business cards of Andrew Yung and William Choi under the W&F Manufacturing name I obtained from them at a trade show around the time of the start of the business relationship between Quick Fitting and the Yung Entities.

7. At the beginning of the business relationship between Quick Fitting and the entities owned by the Yungs, Andrew Yung represented that Cixi City Wai Feng Ball Valve was the manufacturing and production division of W&F Manufacturing. I recall that this was also stated on their Internet website at the time. The Internet archive images submitted with these papers (QF Omnibus Exhibit H), also shown in paragraph 198 of Quick Fitting's Second Amended Verified Complaint, depict what I recall seeing at the time.

8. I understood at the time of the 2010 License Agreement that Andrew Yung was an owner of Cixi City Wai Feng Ball Valve. That understanding came from my communications with Andrew Yung and from the Yung Entities' website.

9. We also received materials from the Yungs showing the involvement of Cixi City Wai Feng Ball Valve in supplying products during the course of our business relationship. For example, submitted as QF Omnibus Exhibit M is a true and accurate copy of an email chain whereby Andrew Yung was providing product certifications to Quick Fitting listing Cixi City Wai Feng Ball Valve as a supplier of brass components. (See final four pages of CSA Certificate of Compliance.)

10. Providing the lowest pricing to customers was a common topic of discussion between Andrew Yung and me, as was the confidentiality of the prices the Yungs were

charging to Quick Fitting and the other costs associated with Quick Fitting obtaining the products and supplying them to its customers. Costs and other financial information is clearly considered confidential and proprietary under the terms of the Quick Fitting agreements. The pricing the Yung Entities charged to deliver and produce the products for Quick Fitting are of course part of our costs.

11. Over time Quick Fitting grew dissatisfied due to product quality and service issues and eventually wished to disassociate itself from W&F Manufacturing and its manufacturing arm, Cixi City Wai Feng Ball Valve, as a supplier. Andrew Yung informed Quick Fitting in early 2011 that Wai Feng Ball Valve was no longer going to be manufacturing products for them.

12. At some point in early 2011, Andrew Yung told me that he and "his uncle" had created a new company, "EFF," that this company was located in "Toronto and in China," and that the new company would be taking over manufacturing operations formerly handled by the "W&F Manufacturing" factory. I informed Andrew that Quick Fitting would need new agreements signed concerning confidentiality, non-disclosure, non-competition, and other licensing terms to add the newly formed entity. That is why we forwarded and discussed with Andrew the 2011 Non-Disclosure Agreement and the 2011 License and Supply Agreement in the Spring of 2011.

13. I made a trip to China and inspected a new EFF manufacturing facility, which was different from the Cixi City Wai Feng Ball Valve facility which I had visited previously. Based on my observations and on discussions with Andrew Yung, I do not believe that any product was supplied by the new entity or factory until after I visited and approved the new facility in China and the 2011 Non-Disclosure Agreement and the 2011 License and Supply

Agreement were executed.

14. The 2011 Non-Disclosure Agreement (QF Omnibus Exhibit A-2) bears handwriting on the first page and indicates it was faxed to Quick Fitting on May 4, 2011 with the handwritten notation "Attn: Donna." Donna Gouveia is a Quick Fitting employee who was routinely involved in communications with suppliers at the time.

15. The 2011 License and Supply Agreement contains a liquidated damages provision for breach of the non-competition provisions of the agreement. Quick Fitting requires all of its suppliers to sign an agreement with this liquidated damage provision prior to providing the supplier with access to its proprietary and confidential drawings, specifications, and other proprietary information.

16. Quick Fitting has spent countless hours and money designing and developing its push-fit products, and in developing its customers. Quick Fitting considers its pricing and cost information to be highly confidential and the disclosure of that information would irreparably harm its marketing efforts and ability to maximize its profits.

17. Quick Fitting began submitting purchase orders to EFF Manufactory at the time of the 2011 agreements. The purchase orders issued by Quick Fitting to the Yung Entities during the course of our relationship are submitted as QF Omnibus Exhibit N.

18. Quick Fitting some time later received a letter from the Yung Entities that I understood was an announcement of the change to the new EFF manufacturing facility. The letter attached as QF Omnibus Exhibit CC dated February 16, 2012 is, I believe, a copy of the letter we received.

19. There was still confusion concerning which company was doing what, however. A few weeks after the announcement, I wrote a detailed email to Andrew Yung complaining

about, among other things, continuing order and invoicing problems.  The email and the response from Vivian Wang is submitted as QF Omnibus Exhibit DD.  Among other things, I told Andrew I understood his company was "EFF" and asked "are you still Wai Feng?"

20.     Vivian Wang's response simply offered to "void the Waifeng Invoice, re-enter the transaction under EFF, let me know." *See* QF Omnibus Exhibit DD.  Though Ms. Wang stated in the response that the original order (#457414) was entered under Wai Feng's name, it should not have been; Order 457414, dated December 16, 2011, was made out to "Ningbo EFF Manufactory Co, LTD." *See* QF Omnibus Exhibit N, p. 38 thereof.

21.     Mueller Industries was one of Quick Fitting's largest customers.  At one point I received a telephone call from Paul Bell, Quick Fitting's contact at Mueller, telling me that Mueller had obtained pricing information detailing what the Yung Entities were charging Quick Fitting brass push-fit products we were selling to Mueller, and that Andrew Yung had indicated his company could sell the products to Mueller directly.

22.     Mr. Bell also also at some point relayed to me that Andrew Yung had told Mueller Quick Fitting had financial problems and was not paying its bills.  This was untrue.  Mueller wanted to impose payment terms less favorable to Quick Fitting as a result.  Quick Fitting CFO Frank Kosky and I made a trip to Tennessee to meet with Mueller in order to smooth over our relationship and to assure Mueller that Quick Fitting was a valuable partner.  Some of the costs of that trip are submitted as QF Omnibus Exhibit SS.

23.     After Andrew Yung informed Mueller of our pricing from the Yung Entities and offered to sell Mueller directly, I knew Quick Fitting was in no position to raise prices it was charging to Mueller for the products, other than for price changes that were driven solely by changes in the price of materials.  I discussed this with Paul Bell.

24. The volume of products sold to Mueller has increased since that time; however Quick Fitting was unable to increase its prices or charge prices in line with other customers due to the Yung Entities' disclosures to Mueller.

25. I learned through this litigation that Andrew Yung and the Yung Entities solicited Watts Water to sell Watts brass push-fit. The three product numbers contained in the email excerpt between Watts Water and Andrew Yung shown below *match* product numbers used by Quick Fitting for three push-fit connector hoses previously manufactured by the Yung Entities for Quick Fitting:





The email is *at* QF Omnibus Exhibit VV, p 2; below it is a Quick Fitting Product Sheet.

- 6 -

26. I am familiar with the single purchase order produced by the Yung Entities to Cixi Welday for "retaining rings" and "release rings." (QF Omnibus Exhibit KK). Cixi Welday would have needed Quick Fitting's confidential manufacturing drawings, designs, and specifications in order to manufacture these parts to fulfill this order as it would have to supply the stainless steel grip rings, as these components must be constructed to minute detail of the proper materials and specifications.

27. I am also aware of an email exchange with Cixi Welday regarding "Quick Fitting Parts" PB712, PB722, PB711, and PB721 (QF Omnibus Exhibit MM). Again, production of these Quick Fitting products would have required Quick Fitting's confidential manufacturing drawings, designs, and specifications.

28. I observed Andrew Yung attending a trade show and staffing the booth of his cousin's company, China Welday, at the AHR Show in January 2014. China Welday had just come out with a line of brass push-fit products that nearly replicated the line the Yung Entities were manufacturing for Quick Fitting under the license agreements. Submitted as QF Omnibus Exhibit NN is a copy of a product sheet I picked up in the China Welday booth at the show. I observed Andrew attending the Welday booth talking to Welday customers with a table of the new Welday brass push-fit products in front of them. I had toured the China Welday facility in China previously and knew China Welday was a plastic products company with no brass forging capabilities to be able to manufacture brass fittings or valves.

29. Quick Fitting had information that the Yung Entities were selling brass push-fit product on various Internet websites. Submitted as QF Omnibus Exhibit III are just a couple of pages of Internet images we and our counsel had found indicating that the Yungs had an Alibaba.com store under the name EFF Manufactory Co., Ltd. at

*waimao.en.alibaba.com* and *waifeng.en.alibaba.com*. The Alibaba web pages pages referenced EFF Manufactory, its address in China, and "Jimmy Yung," who is Andrew and Jacky Yung's father.

30. Also submitted as QF Omnibus Exhibit QQQ are samples of web portal pages for Texoon Brass Works, which was formerly Cixi City Wai Feng Ball Valve Company, the company owned or run by the Yung's uncle and the company Andrew Yung and the Yung Entities had represented was the manufacturing division owned by them and included in the 2010 License Agreement signed by Andrew Yung. Those pages show Texoon offering and selling push-fit products – with photos bearing the "*waifeng.en.alibaba*" name. *Id.*

31. The Yungs had denied offering and selling brass push-fit products on the Internet but were forced to admit they had done so, and finally produced, under Order of the Court and in the *final days* of discovery in this matter, a handful of Alibaba records referencing, without photos, the posting and offering for sale of brass push-fit products on Alibaba.com *during* this litigation. Those records are submitted as QF Omnibus Exhibit BBB.

32. During the course of its business dealings with the Yung Entities, Quick Fitting regularly communicated with the Yung Entities regarding the identity of its customers, markets, and marketing efforts.

33. Quick Fitting has in its license and supply contracts a liquidated damages provision. Quick Fitting's annual sales to its major customers is significantly higher than the liquidated damages amount. The liquidated damage amount is a fair estimate of potential losses and harm, which are difficult to quantify, for breach of the confidentiality, non-disclosure, and non-competition provisions of our supply contracts. As happened with

Mueller Industries in this case, when a contracting manufacturer provides confidential pricing information to Quick Fitting's customer and attempts to compete with Quick Fitting for the customer, Quick Fitting is unable to raise the prices at which it sells to the customer. The resulting damage, which extends over a multi-year period, is difficult or impossible to quantify. The liquidated damages amount was an estimate of our loss of business or loss of business profitability over time.

34. As another example of the harm we anticipated to be covered by the liquidated damages clause, based on our resulting communications with Paul Bell and others at Mueller following Andrew Yung's communications to Mueller, we felt the need to make efforts to smooth the relationship with Mueller due to the disclosure of our acquisition costs and the negative statements. I spent considerable customer-relations time and effort dealing with Mr. Bell and others at Mueller to make sure Mueller respected and wanted to maintain our supply relationship. My CFO and I made at least one trip to Mueller in Tennessee in this regard.

35. Moreover, a good relationship with a qualified supplier is critical to Quick Fitting. Quick Fitting selected the liquidated damage amount to reasonably compensate not only for the harm due to loss of its confidential information, but for the time and costs to Quick Fitting in having to identify and adopt a new, competent, and trustworthy supplier. When Quick Fitting takes on a new supplier for its push-fit products, it takes hundreds of thousands of dollars Quick Fitting's time, extending over many months as it did here, to set up the new manufacturer and get it up to speed to be able to successfully manufacture, test, and supply workable push-fit plumbing products for us. The forging, manufacturing, assembly and testing process requires precise tooling and materials standards by the manufacturer that we at Quick Fitting must communicate, monitor, and test with the

manufacturer on a daily basis.

36.     It is a major investment of Quick Fitting's time and money to do so, involving not only me and my company's business unit, but also our engineering department, quality assurance, and inspection personnel and takes several months just to get a new manufacturer to the point of being able to produce quantities of compliant products. This investment is at least comparable to if not significantly higher than the $500,000 liquidated damages amount contained in our current license and supply agreements.

37.     Quick Fitting's contracting manufacturers have agreed to the same liquidated damages provision and amount. Any reference to the word "punitive" in deposition testimony was intended to reflect my expectation that the amount would be significant enough to offset the aspects of harm and costs described here, which we anticipated but found it difficult to estimate. I recall that Andrew Yung questioned and pushed back on the provision but that I explained our reasons to him and he ultimately signed the agreement.

38.     Some of the product sheets appearing on the *quickfitting.com* website are labelled as "proprietary," but the referenced product sheets do not disclose information necessary for manufacture or production of the pieces. The product sheets contain information used by users/installer of the pieces and is publicly distributed.

39.     Quick Fitting has paid all amounts due and owing to its suppliers and denies owing any money to the any of the parties in this litigation or CA No. 11-463 and CA No. 14-243.

40.     Quick Fitting sells its products nationally. The State of California enacted legislation in 2006 limiting the lead content of plumbing fixtures used for potable water to 0.25%, effective January 1, 2010, and requiring that such plumbing products be certified by

an independent third-party accredited by the American National Standards Institute (ANSI). Vermont enacted a similar law, Vermont 193, which took effect on January 1, 2010, and Maryland followed with similar restrictions effective January 1, 2012.  The federal Reduction of Lead in Drinking Water Act, signed into law in January 2011, amended the Safe Drinking Water Act ("SDWA") to comport federal lead content limits with those already in force in California and the other states.  The SDWA federal regulations took effect in January 2014 and cover plumbing products that convey or dispense water for human consumption through drinking or cooking.  As a result of these laws and regulations, certifying agencies enacted requirements for testing and certification of plumbing products, including what's known as "Annex G" for ANSI/NSF 61, published in January 2009 and setting out a method for calculating the lead content of a product by way of a weighted average of all internal wetted surface areas (now ANSI/NSF Standard 372), consistent with the requirements of the California standard.  These laws and regulations required Quick Fitting to work toward compliance with reduced lead limits well ahead of the January 2014 implementation of the federal SDWA.

41.     Due to the lead-free regulations already in effect in some states and taking effect nationwide, there was a lower demand for leaded product as customers did not want to stock their shelves with products that could not legally be sold in a matter of months.

42.     Quick Fitting ordered lead-free products from EFF Manufactory.  Pursuant to the orders, requirements, and communications conveyed, lead-free products were required to comply with the 0.25% lead content of the weighted average of all wetted surface areas of a product.  Quick Fitting and the Yung Entities had continuous communications throughout their business relationship concerning the lead-free issue.

43. EFF Manufactory represented to Quick Fitting that it was utilizing metal with a lead content below 0.25% lead in order to manufacture Quick Fitting's lead-free products in purported conformance with Quick Fitting's order requirements.

44. I understand the Yung Entities now claim as part of this litigation that Quick Fitting "waived" its requirements for lead-free plumbing pieces due to a single email in December 2011, a copy of which is submitted as QF Omnibus Exhibit HHH. That email, as it states, pertained only to the ball and stem components of the particular *ball valves* in that order. Further, the stem and ball parts make up only a portion of the total wetted surface area of the ball valves (which is part of the algorithm for determining whether the entire product is considered "lead free"), and there were numerous further communications concerning best alloys for use in the stem and ball parts. One example is the email submitted as QF Omnibus Exhibit TTT, wherein Andrew Yung was discussing higher pricing for the use of lead free materials weeks later, in 2012.

45. During the course of the relationship between Quick Fitting and EFF Manufactory, EFF Manufactory routinely supplied Quick Fitting with "Certificate[s] of Quality" which purported to evidence the composition of the metals utilized by EFF Manufactory in creating the products for Quick Fitting. EFF Manufactory thereby represented that it used brass material that complied with the 0.25% standard and Quick Fitting's order requirements. QF Omnibus Exhibit FFF are some Certificates of Quality from EFF Manufactory in the Fall of 2011 and Spring of 2012 evidencing the materials EFF Manufactory claimed to be using to manufacture lead-free products for Quick Fitting.

46. During the spring and summer of 2012, a significant quantity of products received from EFF Manufactory failed to comply with the orders, specifications, instructions,

and drawings provided to EFF Manufactory. Certain of the products were mismarked and required substantial reworking prior to Quick Fitting being able to sell the products. Other products required significant reworking to repair the improper sizing of the internal push ring.

47. Other product received from EFF Manufactory failed to conform with Quick Fitting's order requirement for lead-free products. Quick Fitting tested products received from EFF Manufactory and determined that the lead content of the metals used to manufacture the products exceeded the requirements.

48. Quick Fitting removed from its inventory products supplied by EFF Manufactory that had not then been sold or distributed and placed them in quarantine.

49. Quick Fitting has obtained the Cixi Welday submission to IAPMO for a line of push-fit products. The submission was made in May of 2013, during the same time period when Andrew Yung and the Yung Entities were representing to the Bow Group that they were working with Cixi Welday to develop and obtain certification for a line of push-fit products; communicating with certification agencies representing that they were developing a line of push-fit products and requesting a quotation for obtaining certification for that line of products, and communicating with Watts Water in an attempt to sell them push-fit products and specifically discussing obtaining certification of those products.

50. During the business relationship between Quick Fitting and the Yung Entities, we often received communications from EFF LLC and EFF Inc. indicating their participation in the business with Quick Fitting and the same 10 Brodie Drive, Ontario, Canada address used by Wai Feng Trading and Wai Mao. A sample of such communications are attached as QF Omnibus Exhibit RRR. Moreover, the Yungs' Internet website has described EFF LLC

as the "USA sales" arm of the Yung Entities.

51.  Still today, the Credit Application from the Yung Entities website names EFF Inc. but authorizes credit checks by EFF LLC and recites payment terms to EFF LLC.  See QF Omnibus Exhibit GGG.

52.  The Yungs responded to product complaints in various ways, ranging from issuing invoice credits and accepting some returned product to refusing to assist or even acknowledge the reported problem.  By way of example only, near the end of our business relationship with the Yung Entities, Quick Fitting received approximately 30,000 ball valves from the Yung Entities marked with one Quick Fitting brand while the handles were marked with a different brand name.

53.  The metallic valve assemblies were stamped with the private label brand name Mueller "ProLine," which is what Quick Fitting had ordered:



The plastic handles on the *same pieces* were marked with *a different brand name* – PROBite – a brand used by a *different* customer:




54.  Though the mistake was obvious to Quick Fitting, attached at QF Omnibus Exhibit HH are a couple of the email communications wherein the Yungs denied responsibility for the mismarked handles, demanded an advance payment for the correct handles, and refused to send workers to remove and replace the ball valve handles implying

- 14 -

the workers would have to be sent from *China* rather than from Toronto.

55.     The ProLine push-fit valves were part of a rush order from Mueller Industries. ProLine is Mueller's brand.  One of Mueller's product sheets showing push-fit valves supplied by Quick Fitting is submitted as QF Omnibus Exhibit II.  The supply of these ball valves by EFF Manufactory in the condition described above caused a substantial delay in Quick Fitting's ability to package and deliver the products to Mueller, our largest customer.

56.     Quick Fitting had to purchase special equipment and supplies and put its own employees to work disassembling, cleaning, re-stamping and reassembling the thousands of ball valves.  Submitted as QF Omnibus Exhibit JJ are documents evidencing Quick Fitting's purchase of an ink-cups printer, some of the equipment necessary to correct and replace the mismarked ball valve handles.  This was at the same time the Yung Entities were demanding payments from Quick Fitting.

57.     Submitted as QF Omnibus Exhibit CCC is a collection of documents reviewed at my deposition on September 29, 2014, evidencing other defective products, quantity shortages, and warranty claims, including documents relating to the significant labor costs to repair and re-work product.  This is just a sampling of such documents.

58.     Each shipment of product was accompanied by one or more invoices and shipping documents.  Various Yung Entity personnel would also email such documents. Quick Fitting received invoices for the products from a number of Yung Entities, including Ningbo W& F Manufactory Co. Ltd., Ningbo EFF Manufactory, and Wai Feng Trading Co., Ltd.  For example, submitted as QF Omnibus Exhibit SSS are a few such invoices received from Yung Entities other than Wai Feng Trading, along with emails transmitting them.

59.     I understand that Wai Feng Trading and EFF Manufactory now rely on a

series of invoices that have attached a separate page containing certain terms asserted by them (13-033 Dkt. 172-2, pp. 6-26).  I do not recall ever seeing that separate "terms" page on any invoice received from the Yung Entities.

60. Quick Fitting made payments to the Yung Entities by way of wire transfers to one or more bank account numbers identified by the Yungs.  I did not know which Yung Entity owned the bank account.  I understood that Wai Feng Trading ceased doing business at some point in 2011 and I understood and believed that one of the "EFF" entities took over Wai Feng Trading's business.

61. Quick Fitting's records show that it made payments for products through June 2012, paying more than $51,000 that month.  Submitted as QF Omnibus Exhibit is a record of one of those payments.  Our record shows this payment being made to "W&F Manufacturing (EEF Manufactory)."  *See* QF Omnibus Exhibit GG, p. 3.

62. The Yung Entities statement that Quick Fitting did not pay invoices "beginning in October 2011" is simply not true.  The first invoice for which Quick Fitting withheld payment was Invoice 70786, dated April 27, 2012, for which payment would have been due a month later, though Quick Fitting had in March made a $45,000 advance payment on another order.  The one *earlier* disputed invoice, Invoice 70604, was *dated* October 2011 and partially paid in *December* 2011, minus amounts charged back for defective products.  Andrew Yung in fact had visited Quick Fitting in the Fall of 2011 to inspect large quantities of dirty, pitted product and had agreed to product credits.  Up until filing litigation, the Yung Entities never stated that they believed Quick Fitting owed money on Invoice 70604.

63. Quick Fitting never obtained push-fit products from Welday, nor did it ever supply Welday with drawings or specifications for metal push-fit products.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge or on knowledge gathered by me as President and CEO of Quick Fitting, Inc.

Executed on this 15th day of January, 2018.

David C. Crompton